25-40483. First up, we'll hear Mr. Roberts, ready when you are, sir. May it please the court, counsel. Few things could be more self-evident, more within the common knowledge, the repeated head strikes cause a fatal head injury. That is a quote from this court and more the LaSalle Management Company, and I think that really is the theme, the crux of this case. Mr. Pena was inside of a patrol car in Starr County, struck his head repeatedly in the interior, knocking himself unconscious. The officers acknowledged that, however, they did not provide medical care, did not alert anyone at the jail that it occurred. Then while inside the jail, Mr. Pena again struck his head multiple times, repeatedly causing a head injury, causing him to collapse and go unconscious. And get him to a medical evaluation. Counsel, I hate to interrupt you so early in your presentation because I'm interested in what you have to say, of course. What would put officers on notice, and I'm speaking in general, when someone strikes their head even repeatedly, what would put officers on notice that a person is in need of medical care or has suffered a traumatic head injury as opposed to simply hitting their head multiple times like happened in this case? I think it's the fact that he collapsed and went unconscious. If you look at the Moore case, that's what the Moore case is. Now the Moore case postdates these events, correct? That's correct. It's from 2022, and these events occurred in 2020. So for qualified immunity purposes, Moore is off the table. Well, Moore relied on cases that we can rely on, but I would say for qualified immunity purposes, you look at Dyer. Dyer occurred prior to this case. In Dyer, almost identical facts for the patrol officers occurred. In Dyer, which occurred, the final ruling in July is when that came out in 2020. This occurred the month after. So this is clearly established law for this case, Dyer is. In that case, the arrestee was banging his head inside the patrol vehicle. The officer stopped on the way to the jail to try to prevent him from continuing that conduct. They went on to the jail. They walked him in as he was kicking and screaming is what the opinion says. They did not tell anyone at the jail about what had occurred. They didn't get him medical care or tell the people at the jail who had the opportunity to also provide medical care. Now Dyer, though that's a visible head injury, going back to my question about what would put an officer on notice that someone is in need of medical care or has sustained a traumatic head injury. In Dyer, there's a visible head injury. Isn't that correct? There is a visible head injury, but I think the loss of consciousness is equivalent to that visible head injury. When someone knocks themselves out by hitting their head against something, I think that's obvious as well. Do you think your case is complicated by the fact that on the video, once he collapsed and went down to the ground, it looks like after the officers helped him up that he was able to stand up and speak to them. What are we to do with that when we compare it to Dyer or any of the other cases? Well, I think that the symptom that we're looking at is the collapse and loss of consciousness. And even if someone gets up afterward, it's like if the symptom was vomiting. If someone vomits and then stops vomiting, you don't get to say, oh well, they're no longer vomiting. They completed that act, but the vomiting occurred. I think the loss of consciousness is what the symptom is. I know that a lot of the argument in this case has been about whether or not this is an ambiguous symptom. I think that the defense is trying to liken this to the cases they cited, Arshad, Simmons, Tamez, cases where it was symptoms that could be associated with intoxication or with something much more severe. But in none of those cases were the officers on notice of an immediate preceding event that would cause those symptoms. I guess what I'm trying to make the distinction for, maybe you can help me with this, is he strikes his head any number of times, let's just say in the jail cell, he strikes his head over the course of five or six hours, what, 14 times? Something like 14 times? 17 over two different strikes, but at one point it's 14 times in a row. Okay, and so something, the officers, the defendants in this case, those who are present at that time, need to do something, right? Okay, so if the person is unconscious, they go in and they check on him, I believe, six times, maybe seven, six times on the video, and each time, if he's awake and aware and is able to walk up and down the hallway, at what point do we get into the realm of, you used the term, and I think in the briefing, seeking medical care as opposed to checking on, verifying a person's well-being? Should it be a presumption on their part that if the person is unconscious, even for 30 seconds or 15 seconds, then they need medical care? Is that the line that we should be sensitive to? I do think that when someone knocks themselves unconscious, and that's what Dr. Melanick, our expert, testified to in this case, that when someone knocks themselves unconscious, or even there's a question about whether or not they knock themselves unconscious, they need to be medically evaluated. And I do think this is a case where Easter v. Pal states, an officer's actual knowledge of a substantial risk may only be inferred if the substantial risk was obvious, right? And I know that's something that also, in the 28J letter that was filed today in that Carmona case, Judge Ho had a concurring opinion talking about, there's other ways of showing actual knowledge. If you don't have that, it can be so obvious. And I think this is a case where it's so obvious, and that's why I started with the quote from Moore. I understand that it post-states the events here, but I think the quote is still relevant, especially in determining deliberate indifference, right? Because whether it's before or after, you can still look at it for this court's rulings on deliberate indifference, maybe just not clearly established law. Well, but it sounds like you're arguing that in failing to seek medical care, that is per se deliberate indifference. Whereas in this case, the officers reacted, and pretty quickly, if you look at a matter of seconds before they go into the cell, I'm speaking about when he's actually in the jail cell, they go into the cell to check on him, and at one point put him in a restraint. So they're not deliberately indifferent in that sense. Are we saying now that in failing to get medical care, that's deliberate indifference? I do think that's what the case law says, Your Honor. I don't think it's that they just had to do something, like anything. I mean, when they walk in the jail cell, they use their foot to kick him and roll him over. I don't think that's fair to say, oh, well, they did something by checking to make sure he's alive there. They didn't do anything to check and make sure that his medical needs were met. They don't have medical training. They all testified to that. So them just going in and talking to him, I don't think is sufficient to deal with the medical issue at hand. In Thompson v. Upshur County from 2001, this court stated that it's deliberate indifference to wait until a dire medical emergency has occurred, right? It's not that you just can wait until the acute emergency happens. You have to do something before then. And it's not just something. It's seek medical attention, seek some sort of medical care for that person. I mean, that goes back to from Domino in 2001. And I think that's what Dyer is saying, too. Dyer isn't saying they just needed to do something. They were deliberately indifferent because they didn't get medical care and they didn't tell the jail so the jail could get medical care. And that's what this court talked about. And so I do think that it takes more than simply going in and making sure that they're still awake. Someone can have a fatal head injury and still be talking and be awake. I mean, whenever someone is, you know, maybe concussed in a football game, they're pulled from the game, even though they're walking and talking, because we understand that repeated concussive head injuries can prove fatal. What about speaking hypothetically? What if one or more of these defendants, as part of their training, had taken an extra course in some type of first aid or medical triage or something of that sort? Would that be sufficient? I mean, how are we going to define medical care? Does it involve actually a doctor or rushing someone to the hospital? No, I don't. I think even at least basic first aid, even if that wouldn't have been sufficient, at least trying that, but they didn't do that. No one took his vitals. You can watch the videos. No one's taking his vitals. No one's taking his temperature. No one's commenting on his pupil dilation, which is commented on later when he's in the restraint chair. No one does anything to actually check on his well-being other than talk to him. But I do not think that is sufficient. I don't think that there's any case that Fifth Circuit has that simply just talking to someone after something has happened, when you're aware of a serious medical need, is sufficient to meet your duty and not be deliberately indifferent. And that argument would also apply to the officers who are transporting him from the point at which they apprehended him. I believe he's in the automobile. He's in the unit and banks his head and an officer gets out and sits in the back with him. How does that theory play into that scenario? Yeah, absolutely. I mean, I think that's almost identical to what happened in Dyer. They're going to the jail. He's continuing to hit his head. They stop so that they can try to prevent him from continuing to hit his head, but the court still found that they were deliberately indifferent. Not only the officers in that car, but the officer who was in the trailing patrol vehicle who said he figured the reason they stopped was to prevent him from continuing to hit his head. Should they have taken him to a doctor's office or a Would that be the clearly established jurisprudence that if a person hits their head in a car so hard that an officer has to get out, then you should go straight to the hospital? Well, I don't know that. I would say just they hit it so hard an officer has to get out. They hit it so hard they knock themselves unconscious. Yes, I do think they either need to, A, call 911 and EMT, take him to the hospital, or at least alert the jail. And that's what Dyer said. They didn't even alert the jail because the jail could have provided medical care when they got there. And they did none of those things. The officers in this case testified that they did not alert the jail. The jail has a form on there where they say whether or not there had been a loss of consciousness or traumatic brain injury, and nothing was checked because they were not informed of that information. So yes, it's that they have to do something to provide that medical aid or medical evaluation, whether it's doing it themselves, taking them to someone who can do it, or alerting someone else who can do it. Those are the three options, and they simply did none of those. At any point in time, help me with the videos here, at any point in time did your client complain about a medical condition or asked for some type of medical treatment or asked for any kind of help in terms of his head or any other symptom that he thought he might need medical care? So there's not sound from the videos in the jails. You can't hear exactly what's being said, which goes into our fact dispute about the interaction between Edgar Pena, his cousin, and the officers, and him. There's a dispute as to what was said there. Again, that's a fact issue at this point because there is no sound on those videos. Edgar saying one thing, the officers saying another. With regard to whether or not he actually asked for medical care, I am unaware of any audio that I can hear in the body camera videos saying that, but that's not necessary. Just as the court said in Carmona, if she didn't ask for medical care after these car wrecks that she was in, however, even if she would at least grabbed her abdomen, that may have been enough to put them on notice that there was some sort of internal injury, which I believe was a laceration to her spleen or kidney or something like that. She didn't ask for help, but she could have done that by simply grabbing her abdomen to put them on notice there may be an issue there, and I would posit to this court that collapsing and losing consciousness is the equivalent of grabbing the abdomen. Mr. Pena was clearly not in his right state of mind, and when he was banging his head hard enough to make him collapse on the ground or in the back of the car unconscious, that's where the duty to protect someone in your custody and care comes into play. They don't have to ask for help. If you can see that they need that help and they are unable to provide that help for themselves. And you say that that duty arises even if they are unsure if the person has knocked himself unconscious. Well, they need to be sure. However, that's a fact issue as to whether or not these officers were sure or were aware of a sufficient serious medical need. I know that in the Ford v. Anderson County case that you were on, Judge Douglas, there was an issue about whether or not the jailers in that case were aware that someone had been yelling throughout the night and whether or not they had seen the black vomit in that cell. They said they hadn't, and that court that you were on said, well there's a fact issue for the jury because they were present in the hallway where they could have heard the yelling and they went into the cell where they could have seen the black vomit. And so there's a fact issue the jury can determine as to whether or not they were aware of that to put them on notice that there was a serious medical need. And I would take it back even to Thompson v. Upshur County where in that case it was a case of delirium tremens, DTs. The officer said that or the jailer said she wasn't quite sure that this was a serious enough medical need that required her to give attention. The court in that case stated that she, Wharton was her name, may have subjectively intended to be harmed, deliberate indifference, or she may have negligently believed that DTs was not a serious medical need. But the issue of Wharton's state of mind is for the trier of fact. Just like what Farmer v. Brannon says in the Supreme Court that whether a prison official had the requisite knowledge of a substantial risk is a question of fact. To be looked at using circumstantial evidence to conclude that a prison official knew it was substantial risk and the very fact the risk was obvious. Again that's what Judge Ho was talking about in his concurrence in Carmona. This is an obvious case. I think that's what this court is saying and more. A few things to be more self-evident, more within the common knowledge that repeated head strikes can cause a fatal head injury. It appears that the defendants in this case are simply avoiding the fact that he had just struck his head repeatedly. It'd be like if you saw someone leaving Jazz Fest and they get hit by a car and they don't get off the ground you wouldn't say oh they must be drunk. You'd say they just got hit by a car. The immediate preceding event which caused the symptom that you see, them on the ground, Mr. Pena unconscious, collapsed on the car or on the ground, is what you have to look at. So this isn't one of the ambiguous cases where they don't know what's going on. They do know what just happened and they know that it just caused what occurred. And so I do think that that puts us in the obvious case scenario. If Dyer, if you don't believe that Dyer clearly establishes it because Dyer uses the word visible head injury, I would say a concussion is a visible head injury. There were red marks and bumps on his head as well that the jailers testified to that would also be visible head injuries. I do see my time is up. Thank you. All right, thank you counsel. You have reserved your rebuttal time. Mr. Drinkard. Good afternoon. May it please the court. I think counsel's opening statement in referring to more that led to the questions essentially sums up what we believe is the entire flawed argument here. There is no doubt that head strikes can cause a serious injury, but in doing that he's reading out the element that they have to draw the inference that there is a serious injury because head strikes can also not result in a serious injury. So what they're trying to do here is get this court to draw a per se line that says head strikes of whatever duration, of whatever severity, if it results in, you know, unconsciousness of maybe one or two seconds, necessarily constitutes a serious injury that requires medical attention. And what they're really asking for there is precautionary or preventative medication. Check them out just in case. That is really what the argument here is and the deliberate indifference standard, as this court has found, requires more than that. It requires not only the objective element about whether the facts exist that there could be a serious medical injury, but they have to draw that inference. And here, and this is why we don't believe more is applicable, dire is applicable, not only are the facts significantly different. How? How is your case distinguishable from dire? From dire? For several reasons. One, notably, is that there was a actual, and it was described by the paramedics, as a severe, serious head wound on his head. So there, in that case, they could actually look at him and have something to look at to determine maybe there is a serious injury here because he has an actual head wound. In this case, we don't have that. In fact, that's one of the biggest issues, is that from the very start of this, the deputies who actually arrested him and brought him in, all the way through the day shift and the night shift, never noticed any severe wounds, gashes, anything on his head that would lead them to believe that there was an issue with a serious medical attention. The other way this disagrees with dire is that there was no extended period here of non-responsiveness. And each of the deputies and the jailers that testified about loss of consciousness said they interpret that to mean, when they go through their medical policy and whether they have to get some medical attention, whether they are just non-responsive for an extended period of time, not you're out for a second, you're out for two seconds, and at that point you're able to, you're conscious, you're able to interact, you are not visualizing or verbalizing that you have pain or that you have any medical issue. And Mr. Pena never did that. Never did that with the deputies, never did that with the day shift, and never did that with the night shift jailers. Never gave them a reason other than merely the fact that he banged his head, that he had in fact suffered a serious head injury for which they believed and they drew the inference that he needed medical attention. And we believe that the autopsy confirms the reasonableness of that. I mean a medical autopsy, a forensic pathologist looked at, when he did the autopsy, looked at his head and determined that that not only was there was no serious head injury that contributed to his death, but there was no head injury at all. In fact, the description with respect to his skull and his brain was unremarkable. So what the plaintiffs are trying to do is actually put these jailers and deputies to a higher standard than what a medical professional determined, and the reason they're trying to do that is because what they're saying is, get them precautionary medicine. Even if you don't think he's hurt, you know he banged his head, there could be a serious head injury. So go get them medical attention. Counsel, let me ask you, your opposing counsel stated that there was no sound to the videos and also made the analogy of like a concussion protocol. Used to be, I know those are now very sophisticated in the NFL and elsewhere, but it used to be the three questions about what's your name, what city are you in, and who's the president? And if you could answer those three, then you pass the concussion protocol. Was there any evidence in this case, testimony or otherwise, that the plaintiff, I should say that the decedent, was hallucinating or speaking gibberish or, you know, stating things that were detached from reality when the officers at any of these defendants encountered the decedent? Not until arguably when his cousin Edgar comes over to talk to him at the cell at 8 53 p.m. because what Edgar describes is that he heard him say, mom, dad, Alex, who is his son, help me. And then when Edgar went to talk to him, he was kind of rambling, yelling. There's no evidence, even if one considers that to be incoherent, babbling, or whatever, there's no evidence that anything like that was ever said until 8 53 p.m. And there is evidence, although I don't think the exact questions that your honor mentioned about the three questions. Well, I'm asking for Thompson purposes because in Thompson, as I understand it, the person, the decedent was speaking, was hallucinating, and was detached from reality and saying things to the extent they were understandable that were completely, as I say, detached from reality. And so since we're using that case among the others as a benchmark, we should compare. Yes, and I think Dyer also had an element, a component to it like that. And there's no evidence that any of that occurred here. The evidence shows that the day shift jailers interacted with him, asked him questions, talked to him. Even when he went to booking, they asked him background questions that he was able to answer. Similarly, when the night shift came on, they engaged with him. He asked for water. He said he was hot. He asked for water to put over his head. So he was interacting with them, conscious and interacting with him throughout this entire five-hour period from three o'clock when the arrest starts right up until the conversation with his cousin Edgar at 8 53. Do you have a case that speaks to whether or not we can use the autopsy findings in our analysis? I found no case that in which there was medical evidence that either showed or had a dispute about what the serious medical condition was. There's no case, I don't think a case has been brought where it's been argued there was a serious medical condition that you failed to get medical attention. And the medical, the actual medical evidence showed that there was no such medical attention. I couldn't find a single case. What was the determination of cause of death? For the, in the autopsy, heart attack combined with mixed drug, mixed drugs. So nothing associated with the head injury. Nothing associated with the head injury. In the analysis, because he was thorough, so there was an analysis in which he looked at the skull, he looked at the brain and determined it was completely unremarkable. So we, again, we feel that they're trying to hold the jailers, who aren't medical professionals, to a higher standard. How old was he? I'm sorry? How old was he? He was, I believe, 38. But I might be off a little bit on that one. And because of that, that's why we think that we, I know we brought a couple of cases to your attention late, and I apologize for that. We filed a letter, two of them, Rogers v. Jarrett, and of course the Carmona versus Brownsville case. And in Carmona, they explicitly shoot down this theory that, well, a head injury can, or excuse me, a head bang can cause a head injury. When they say everyone knows a car accident can cause internal injuries, but that's not enough based on the totality of circumstances, you have to observe them and determine and draw the inference that there are internal injuries. And that didn't happen here. And I would argue that the most, the case most on point, of course it occurred after this, so I don't believe that for purposes of the clearly established law it applies, but I do believe it applies in terms of an analysis of deliberate indifference, is the Rogers v. Jarrett case, in which a ceiling collapsed on a detainee. He, according to the facts of that, he blacked out or went unconscious. The jailers were fully aware of that, but did not see any wounds, any injuries, anything on his body to lead them to believe that he was injured. Plus, when he, first he wanted to go get medical attention, and then when they offered it, he said, no, I changed my mind. I want to eat. I'm hungry. And they took that to mean, well, if we don't see anything on his body in terms of injury, and he's doing normal activities, let's say he wants to eat, they didn't draw the inference that there was anything wrong with him, even though they knew he had a serious headbang because the ceiling collapsed on him. And we believe that's what's applicable here, because Mr. Pena, for four hours, is doing all the things that essentially what a normal detainee would do. He's walking, pacing, talking, interacting. He takes food and water and goes and sits down on his own, eats and drinks. He's able to walk back from the cell, back to booking, answer background questions, interact, comes back. He's able to move around his cell, hit the window, kick the window. All the things that would, that would lead the dealers, and in this case did, that there's no serious head injury here. They didn't see anything by which they drew an inference that he was, and there's real, there's not a fact issue on that. They want to, the argument here is, well, they should have drawn that inference based on the facts, but we would argue that is not the standard. So we don't believe, and this applies for all of them, they're slightly different fact patterns. I don't think the issue of consciousness, even though it is disputed, I don't think it's a material fact. I don't think the trial court considered it a material fact. In fact, the trial court explicitly said, we're going to assume and adopt plaintiff's factual version for that and assume that he did lose consciousness for a second or two, and we still find the way we did. Justice Douglas, to your point earlier, your question earlier, after the 14 head strikes, he does drop to his knees. Of course, we don't know whether that's because days from getting his head or just exhausted, but he's immediately, he gets up, he's helped up, he walks around, goes outside, interacts, and talks to the jailers so that they have no reason to believe that there is a serious head injury. It's hypothetical, and if it exists, it's hidden, and that's in Simmons v. C.E. of Columbus. That's what was talked about there. That's what this court found. If there's a hidden brain injury, a hidden brain bleed, and they don't draw the inference that they do, they're entitled to qualified immunity on the deliberate indifference, and we believe that applies here. So based on all those elements, when you when you layer in the medical evidence, the autopsy, we think that to hold that they're not entitled to qualified immunity would essentially be applying a standard that head bang equals serious head injury, get them medical attention, and reads out the totality of the circumstances about how they're acting, how they're interacting, and also reads out that subjective element about whether the deputies or the jailers have actually drawn the inference that there is a serious head injury. So for that reason, we believe the trial court correctly found qualified immunity as to each of the the jailers and the deputies, and I would note that there was an issue that came up. The trial court looked at it and analyzed it also from the sense that well, maybe intoxication might have been a serious medical condition for which they could have done something. The trial court ultimately determined that that was not the case, that based on the symptoms, which are at best vague, what they're perceiving is just intoxication, that it didn't meet that clearly established element, but I would note that the plaintiffs, it is our position that with the issue they presented to this court in this appeal, have waived an argument about another serious medical condition other than head bang, head injury, and we in the trial court, we had a little trouble with that because it seemed to be, that goalpost seemed to be moving about what the actual serious medical condition that the jailers and the deputies were deliberately indifferent to. We had trouble figuring it out because I think the plaintiffs had trouble figuring it out, which really sums up here what we think, which is there wasn't one, and if there was, it wasn't visible and there was no symptoms that would lead them to believe that he had a serious head injury, much less that they ever drew that inference. I would touch just briefly on, I know that didn't get to it with the plaintiff's counsel, but as to the county, the theory against the county was that obviously deliberately indifferent and that there was a failure to monitor, and the basis for that seems to be that there was a suicide in that jail two years earlier. We don't believe that that's a factually similar situation. The suicide and that the standards appropriate to observing were totally different. The time differences, not factually similar in terms of providing medical attention, but what's more, and it's in the record, is that after that suicide, the jail changed its policies. It was trying to adapt. It went from 45 minute observations to 30 minute observations for everybody, but to be on the safe side, implemented a practice of 18 minute observations for everybody, whether they're restrained prisoners, whether they're on suicide watch, or regular prisoners. So that alone defeats the deliberate indifference standard in terms of Monell for the county. So, you know, we don't think it's sufficiently numerous. We don't think it's sufficiently similar in facts under the Peterson standard, and we believe that essentially what happened here is that, as the plaintiffs argue, there was really one delayed observation, and it was delayed only when you compare it to the state standards, which were 15 minutes, and the state standards do not equate to constitutional standards, but the delay there was four minutes. So we don't believe, we think the trial court correctly denied, granted the summary judgment, found no fact issue with respect to Monell under both the conditions of confinement and the Monell theory, the episodic ax Monell theory. So I've got three and a half minutes left. I think I'm done, unless anyone has any additional questions for me. Thank you, sir. Thank you. All right. Rebuttal, Ms. Boss. May it please the court. First, I'd like to get into the autopsy issue. Plaintiff's expert, Dr. Melanik, said that the presence of extensive sublial hemorrhages in the context of repeated head impacts and a witness unconsciousness following one of those impacts, with cerebral edema and vascular injury, indicate that concussive head injury also plays a significant role in Alberto's deaths. That is at the record of appeal at 4085. So we have plaintiff's experts saying that cumulative head packs from inside the car and jail cell caused Mr. Pena's traumatic brain injury. Physiologically, what was that opinion connected to? I noticed what he said, but physiologically, what parts of the examination or visible, well, way I asked it to start with. Physiologically, what was that opinion connected to? Do you understand my question? Yes, that was connected to Dr. Melanik looking at microscopic sections of Mr. Pena's brain and showing the presence of those hemorrhages when she looked at the microscope examination of his brain. I'd also like to address the Rogers case. Opposing counsel kind of did not really describe what happened in that case. Even though the plaintiff did not have visible symptoms when he first sustained his head injury and lost consciousness, once he did later on, prison staff immediately sought medical aid for him. So he didn't have symptoms at first, so that's why they didn't think there was a serious medical issue, but once he did present those symptoms, they actually immediately got medical attention in the Rogers case. I'd also like to address opposing counsel's argument about the officers not being subjectively aware there was a serious medical issue. At the record of appeal at 3138 at 6 minutes and 45 seconds to 7 minutes and 10 seconds, Rios tells defendant Cervantes that Pena was banging his head, knocked himself out, and needed to get EMS. Cervantes agreed with that. At the record of appeal at 3267, Garcia testified that someone who loses consciousness should be given medical attention even if they wake up because of the loss of consciousness. Also, your honors, at the jail, Lopez testified that Mr. Pena was dazed and someone at his daze needs medical attention. That is at the record of appeal at 3321. With my remaining time, and also your honor, I will say that Mr. Pena was also meowing after he lost consciousness at the jail and he was also mumbling. So those were the physical manifestations of symptoms that he was presenting when he lost consciousness during the transport. I'd like to briefly talk about the Monell claim. Here we have a failure to monitor claim due to episodic acts or omissions and conditions of confinement. There was the perfect storm here of the policies that Stark County had with the failure to monitor. That was the inadequate RAP system, monitoring that, which is double the Texas Commission on Jail Standards. Sheriff Wintas, the chief policymaker, said that the policy was 30 minutes, which is double the Texas Commission on Jail Standards policy. So we have the chief policymaker actually saying it's double than what the Texas Commission on Jail Standards is requiring. He testified to that and that is at the record of appeal at 3815 to 3816. Even though the policy for the Texas Commission on Jail Standards requires 15 minutes, again, there was double. There was also no policies. Is that negligence? Is that negligence or maybe even gross negligence? But is that deliberate indifference? That is deliberate indifference because we have a person, Mr. Muniz, dying as a result of that policy because of the failure to follow face checks, face-to-face checks, and then Mr. Pena dies from that. The Sanchez case says that even though the Texas Commission on Jail Standards is a non-compliance report, that still can show an unconstitutional policy, especially when no remedial actions are taken after that. And there is no discipline in this case when both that's happened. Beyond Monell itself, what's your strongest case on the Monell claim, vis-a-vis these facts? It would be both the Sanchez case and the Montano case, Your Honor, which the Montano case says you don't have to show there was an intent to publish and or tarred to punish. And then Montano also says there's no formal written policy required. Specific prior examples are not needed. When multiple employees act in an unconstitutional manner, that shows a de facto policy. Also, when there's a failure to reprimand after the inmate's death, that also shows that there is an unconstitutional policy. So we have multiple employees that have testified there is no policy in regards to the video monitoring. We have multiple employees testifying that they did not have any training on when to recognize there's a head injury, when to recognize that someone needs medical attention because they are in medical distress. And we also have the fact that no punishment occurred and no significant policy changes were occurred after both the first death that happened in the Muniz matter when a detainee died due to a lack of failure to monitoring when he committed suicide. And that policy also wasn't changed after Mr. Pena died, also due to a failure to monitor when he was able to die during the rap restraint system. All right. Thank you, ma'am. You have a red light. Thank you for your rebuttal. This concludes your arguments in this case. Thank you, counsel, for significant briefing in the case. Obviously a tragic case, but we'll take a good hard look and we'll get it decided. That said, this concludes the oral arguments for this panel. The argued cases along with the non-argued cases will be submitted for decision and the panel stands adjourned.